**SIERRA CLUB et. al., Plaintiffs,**

**v.**

**Dale BOSWORTH, in his official capacity as Chief of the United States Forest Service, and United States Forest Service, an agency of the United States Department of Agriculture, Defendants.**

**No. 01–3901 MMC.**

United States District Court,
N.D. California.

April 17, 2002.

Marc D. Fink, Western Environmental Law Center, Eugene, OR, Julia Olson, Wild Earth Advocates, Oakland, CA, for plaintiffs.

Charles O'Connor, Chief, Environmental & Natural Resources, San Francisco, CA, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

CHESNEY, District Judge.

Before the Court are cross-motions for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. The matters came on regularly for hearing on March 15, 2002. Marc Fink of Western Environmental Law Center appeared on behalf of plaintiffs. Charles O'Connor, Assistant United States Attorney, appeared on behalf of defendant United States Forest Service ("Forest Service"). Having considered the papers filed in support of and in opposition to the motions and the arguments of counsel, the Court rules as follows.

### BACKGROUND

In the instant action, plaintiffs challenge the adequacy of the Final Environmental Impact Statement ("EIS" or "FEIS") prepared by the Forest Service in connection with the Fuels Reduction for Community Protection project ("Fuels Reduction Project") on the Six Rivers National Forest ("Six Rivers"). In August, 1999, three small fires known as the Megram, Fawn, and Onion fires (collectively the "Big Bar Complex Fires") ignited on the Shasta–Trinity National Forest. After merging with the Fawn fire, the Megram fire burned approximately 59,220 acres of the Six Rivers National Forest, as well as many acres of the adjacent National Forests, an Indian Reservation, and private lands, before the fire was controlled on November 4, 1999.

The fire created extensive areas of dead and dying trees and shrubs which the Forest Service believes may become fuels for future fires. In an effort to reduce the intensity and severity of future wild fires within Six Rivers, the Forest Service has proposed numerous commercial logging projects designed to construct "strategic fuel breaks" and to "reduce fuels" in already burned areas.[1] In the instant action, plaintiffs challenge the EIS prepared in connection with Phase 1 of the Fuels Reduction Project ("Phase 1"), asserting that the EIS violates the National Environmental Policy Act (NEPA), and the National Forest Management Act ("NFMA").

## LEGAL STANDARD

### A. Judicial Review under the APA

Plaintiffs's claims are reviewed under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Under the APA, courts must "set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observation of procedure required by law." *See* 5 U.S.C. § 706(2)(A) & (D). In determining whether an agency action is "arbitrary, capricious, or an abuse of discretion," the court considers whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998). When evaluating the adequacy of an EIS, the court must determine whether the EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *See Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1376 (9th Cir.1998). The court must ensure that the agency took a "hard look" at the environmental effects of the proposed action. *See Vermont Yankee v. Natural Resources Defense Council*, 435 U.S. 519, 535, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

In interpreting NEPA, courts give substantial deference to the regulations issued by the Council on Environmental Quality ("CEQ"). *See* 42 U.S.C. § 4342 *et. seq.; Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (holding CEQ regulations entitled to substantial deference).

### B. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. The moving party need not produce admissible evidence showing the absence of a genuine issue of material fact when the nonmoving party has the burden of proof, but may

---

**1.** A fuel break is "a strategically located wide block, or strip, on which a cover of dense, heavy, or flammable vegetation has been permanently changed to one of lower fuel volume or reduced flammability." AR 9397.

discharge its burden simply by pointing out that there is an absence of evidence to support the nonmoving party's case. *See Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). When determining whether there is a genuine issue for trial, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## DISCUSSION

### A. Violations of NEPA

NEPA requires that impacts of "major Federal actions significantly affecting the quality of the human environment" be considered and disclosed in a detailed EIS. *See* 42 U.S.C. § 4332(2)(C). NEPA, therefore, "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience." *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Under NEPA, the Court must "ensure that the

procedure followed by the Service resulted in a reasoned analysis of the evidence before it, and that the Service made the evidence available to all concerned." *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985).

Plaintiffs claim that the EIS prepared for Phase 1 violates NEPA "because it [1] fails to disclose and address the scientific evidence that directly contradicts both the statement of need and environmental analysis for the proposed action; [2] fails to adequately assess cumulative impacts; [3] fails to include all connected, cumulative and similar post-fire projects; and [4] fails to adequately address the likely impacts to soils in the projected areas." (*See* Pl. Mem. at 11.)

### 1. Purpose and Need

#### a. *Lack of Supporting Evidence*

The Forest Service states that the purpose of Phase 1 is to "protect[ ] local communities from catastrophic wildfires and extended exposure to smoke" by "reduc[ing] fuels." (*See* AR 246.) According to the Forest Service, the Phase 1 project will reduce the intensity of future wildfires by removing the "fuels" that help to spread the fires.

Plaintiffs assert that the EIS violates NEPA by failing to disclose the lack of scientific evidence supporting the Forest Service's belief that the Phase 1 logging project will reduce the intensity of future wildfires and by failing to address reports that contradict the Forest Service's belief. *See Seattle Audubon Society v. Lyons,* 871 F.Supp. 1291, 1318 (W.D.Wash.1994) (holding EIS must "disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it."). In particular, plaintiffs note that the EIS fails to disclose or discuss that a "Literature Review" of post-fire logging studies, completed by the For-

est Service's Pacific Northwest Research Station in 2000, "found no studies documenting a reduction in fire intensity in a stand that had previously burned and then been logged."[2] (See Fink Dec. Exh. A, p. 21.) Plaintiffs also assert that the EIS fails to disclose and analyze an independent report on ecologically sound post-fire salvage logging, known as the "Beschta report," which also concluded that "no evidence supporting the contention that leaving large dead woody material significantly increases the probability of reburn."[3] Plaintiffs point out that the Forest Service, in its Literature Review, acknowledged there is an "intense debate" over post-fire logging and yet the EIS, plaintiffs' assert, fails to disclose or analyze the contrary opinions and fails to "address the uncertainties surrounding the scientific opinion upon which the entire project is founded." (Pl. Reply at 1.)

In response, the Forest Service does not contend that the EIS discloses or analyzes the scientific evidence that supports or that contradicts the goals of the Phase 1 project. Rather, the Forest Service contends that evidence supporting its position can be found within the administrative record and that its scientists did, in fact, consider contrary opinions, including the Beschta report.

It is not an adequate alternative, however, to merely include scientific information in the administrative record. NEPA requires that the EIS itself "make explicit reference ... to the scientific and other sources relied upon for conclusions in the statement." See 40 C.F.R. § 1502.24; see also Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1072 (1st Cir.1980) ("We find no indication in [NEPA] that Congress contemplated that studies or memoranda contained in the administrative record, but not incorporated in any way into an EIS, can bring into compliance with NEPA an EIS that by itself is inadequate"); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (9th Cir.1998) (holding Environmental Assessment ("EA") inadequate where EA contained "virtually no reference to any material in support of or in opposition to its conclusions;" deficiency not cured by support contained in administrative record.)

■ Nor does the fact that the Forest Service's scientists may have considered contrary opinions, such as the Beschta report, constitute sufficient compliance with NEPA where the EIS fails to disclose or analyze such opinions.[4] See Seattle Audubon Society v. Moseley, 798 F.Supp. 1473, 1482 (W.D.Wash.1992) ("NEPA requires

**2.** The literature review is entitled "Environmental Effects of Postfire Logging: Literature Review and Annotated Bibliography." (See Fink Dec. Exh. A, p. 1.)

**3.** The report is entitled "Wildfire and Salvage Logging: Recommendations for Ecologically Sound Post–Fire Salvage Management and Other Post–Fire Treatments on Federal Lands in the West" and was completed in 1995.

**4.** The Forest Service contends that the Beschta Report is mere "commentary" and "opinion," rather than a scientific study, because "there is no evidence that the Beschta Report was published in the scientific literature or subject to peer review prior to its issuance."

(Def. Mem. at 13.) Regardless of whether the Beschta Report was published as a scientific study, it is undisputed that the Beschta Report constitutes scientific opinion, as it was prepared by and represents the views of scientists from the United States Fish and Wildlife Service, the Columbia Inter–Tribal Fish Commission, and a number of Universities. (See AR 2689.) Further, the Literature Review prepared by the Forest Service credits the significance of the report. Finally, the Court notes that the Regional Forester for the Pacific North West (Region 6) has directed that the Beschta report recommendations be addressed in all post-fire environmental review documents.

that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to the adverse opinions held by respected scientists."); *Lyons,* 871 F.Supp. at 1318 ("An EIS must . . . candidly disclose the risks and any scientific uncertainty. It must also disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it.") (citations omitted).

Accordingly, the Court concludes that the Phase 1 EIS violates NEPA by failing to disclose and analyze scientific opinion in support of and in opposition to the conclusion that the Phase 1 project will reduce the intensity of future wildfires in the project area.

### b. *Contrary Scientific Evidence*

■ Plaintiffs also assert that the EIS fails to disclose and analyze scientific opinion that is directly opposed to post-fire logging on the ground that it has a detrimental effect on the environment. Specifically, plaintiffs assert that the Forest Service erred in failing to disclose and analyze studies, such as the Beschta report, which recommended that no salvage logging occur in sensitive areas including severely burned areas and erosive sites. According to plaintiffs, the "EIS does not mention or discuss the substantial weight of scientific evidence that opposes logging in the aftermath of intense wildfire" and, thus, members of the public who are reviewing the EIS "would be unaware that there is a considerable controversy and debate surrounding the potential impacts of post-fire logging." (*See* Pl. Reply at 11).

In response, the Forest Service does not contend that the "considerable controversy and debate" identified by plaintiffs does not exist. Nor does the Forest Service explain its failure to identify or address in the EIS the scientific opinion that opposes post-fire logging. Rather, the Forest Service merely challenges the importance of and applicability of the Beschta report for the Six Rivers region. The Forest Service's critique of this one report, however, does not explain why the Forest Service failed to disclose or address any contrary scientific opinion in the EIS. *See Lyons,* 871 F.Supp. at 1318 ("An EIS must . . . candidly disclose the risks and any scientific uncertainty. It must also disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it.") (citations omitted.) Although the Forest Service is not required to adopt the recommendations contained within the Beschta report and may rely on other expert opinion instead, the Phase 1 EIS fails, "not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections." *See Moseley,* 798 F.Supp. 1473, 1482.

Accordingly, the Court concludes that the EIS violates NEPA by failing to disclose scientific opinion that opposes post-fire logging.

### 2. Cumulative Impacts of the Phase 1 project

■ NEPA requires that, where "several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS." *See City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990); 40 C.F.R. § 1508.25(a)(2) (requiring federal agencies to consider "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"). " 'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such oth-

er actions." 40 C.F.R. § 1508.7. NEPA requires that the EIS analyze the combined effects of the actions in sufficient detail to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *See City of Carmel–By–The–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *See Neighbors of Cuddy Mountain*, 137 F.3d at 1380.

Plaintiffs contend that the Phase 1 EIS fails to consider cumulative impacts on wildlife and soils of past, present and foreseeable future actions. Specifically, plaintiffs contend that the EIS fails to consider pre-fire logging that occurred within the same area between 1997–1999, as well as the actions taken to fight the 1999 wildfires such as bulldozing firelines and the use of chemical fire retardant (past actions); recent timber sales within the area as well as logging that is occurring in the nearby Hoopa Indian Reservation (present actions);[5] and the effects of Phase 2 of the Fuels Reduction Project ("Phase 2") and the proposed post-fire logging in the adjacent Shasta–Trinity National Forest (foreseeable future actions). Plaintiffs also assert that the Forest Service failed to include cumulative impacts analysis of fuel break maintenance and the firefighting tactics employed by the Forest Service to fight the Megram fire.

### a. *Wildlife*

■ Plaintiffs assert that the EIS failed to adequately consider the cumulative effects on the "management indicator species" ("MIS") for Six Rivers. Specifically plaintiffs assert that "[t]he Phase 1 EIS fails to disclose all of the management indicator species on the Six Rivers National Forest that may be affected by the logging proposal, fails to evaluate the alternatives in terms of their impact on habitat and the population trends of indicator species, and includes no cumulative effects analysis." (*See* Pl. Mem. at 22.) MIS are species who are monitored "as a bellwether … for other species that have the same special habitat needs or population characteristics." *See Inland Empire Public Lands v. U.S. Forest Service*, 88 F.3d 754, 762, n. 11 (9th Cir.1996).

In Six Rivers, forty-one fish and wildlife specifies have been designated as MIS. The EIS, however, considers the effects on only six of the MIS: the Northern spotted owl, the pileated woodpecker, the black bear, the American marten, the Pacific fisher, and the Black-tailed deer. *See* AR 329. Although the Forest Service asserts that the Phase 1 project only impacts the habitat of these six MIS, the Forest Service cites no basis for this assertion. (*See* Def. Mem. at 22.) In the absence of such support, the Court is unable to determine if the Forest Service took a "hard look" at the potential impact on other MIS.[6]

■ With respect to the six MIS considered by the Forest Service, the Forest Service argues that cumulative impacts to

---

5. Plaintiffs identify the following present actions: (1) the "Megram Roadside Hazard Tree Project;" (2) the "Happy Plantation Project;" (3) the "Phase 1" and "Phase 2" logging projects; (4) the "Plantation Precommercial Thinning, Release, and Fuels Treatment project;" and (5) the "Plantation Planting, Site Preparation, and Fuels Treatment project." (*See* Pl. Mem at 20.)

6. For example, the hairy woodpecker is one of the MIS for Six Rivers. The Literature Review found that "[m]ost cavity-nesters showed consistent patterns of decrease after logging, including the mountain blue-bird and the black-backed, *hairy*, and three-toed *woodpeckers*." (*See* Fink Decl. Ex. A at 23) (emphasis added.)

these species are considered in the EIS, the Biological Assessment ("BA") and/or the Biological Evaluation ("BE") prepared in connection with the Phase 1 project.[7] Specifically, the Forest Service contends that impacts on the Northern spotted owl are considered in the EIS, as well as in the BA, impacts on the American marten and the Pacific fisher are considered in the EIS, as well as in the BE, and impacts on the black bear, black-tailed deer, and pileated woodpecker are considered in the EIS. (*See* AR 2043, 2064, 330) These documents, however, do not demonstrate that the Forest Service considered cumulative impacts of past, present and future actions on these species. Rather, they suggest the opposite, as the EIS does not consider any cumulative impacts[8] and the BE and BA considered only the cumulative effects of the proposed Phase 2 project without listing or analyzing past and present projects in the area. (*See* AR 2061, 2080.) This incomplete analysis violates NEPA, which requires that an EIS "catalogue adequately the relevant past projects in the area" and include a "useful analysis of the cumulative effects of past, present and future projects." *See Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 809–10 (9th Cir.1999). Although the Forest Service asserts that the past actions in

the area are no longer relevant because the Megram Fire "destroyed most, if not all, past projects effects to the habitat," the Forest Service has not provided any citation to the record demonstrating the scientific basis for this assertion. (*See* Opp'n at 21.) Further, the Forest Service offers no justification for its failure to describe nearby logging projects that began after the fire ended. As past and present actions were not listed, described or analyzed, "neither the courts nor the public, in reviewing the Forest Service's decision[ ], can be assured that the Forest Service provided the hard look that it is required to provide." *See Neighbors of Cuddy Mountain*, 137 F.3d at 1380.

According, the Court concludes that the EIS fails to adequately disclose or analyze cumulative impacts on management indicator species as required by NEPA.

b. *Soils*

▮▮▮ Plaintiffs also assert that the EIS fails to include an adequate analysis of cumulative impacts to soils from pre-fire logging, bulldozed firelines and smaller logging projects that have occurred or are ongoing in the area. In response, the Forest Service explains that the EIS discloses the relevant past and current activi-

---

7. The BE and BA were incorporated "by reference" into the EIS. (*See* AR 00323—00324.)

8. For instance, with respect to the black bear, and the black-tailed deer, the EIS states only that Phase 1 would have positive effects because "[b]lack bear would benefit from the retention of snags and down logs in treatment units, and increased short-term shrub growth expected in units" and that the "[b]lack tailed deer would benefit from increased short-term shrub growth expected in units." (AR 330.) Such conclusory statements fail to either disclose the impacts of past, present, or future projects on these species or demonstrate that the Forest Service considered these effects. The Forest Service asserts that the black bear, black-tailed deer, and pileated woodpecker

are also "addressed within the discussions pertaining to riparian reserves, snags, and large woody debris recruitment." (*See* Youngblood Decl. ¶ 7.) In support, the Forest Service cites ten pages of the EIS containing an analysis of the effect of the removal of large dead and dying trees from riparian reserves, focusing particularly on aquatic habitat. (*See* AR 339–44, 351–53, and 354–55.) Neither the black bear, black-tailed deer, nor the pileated woodpecker is mentioned within these pages. The Court concludes, therefore, that the "discussions pertaining to riparian reserves, snags, and large woody debris recruitment" also fail to adequately disclose or analyze the cumulative effects on the black bear, black-tailed deer, and pileated woodpecker.

ties "by describing current soil conditions following the Megram Fire and by analyzing direct project effects." (Def. Mem. at 25.) According to the Forest Service, cumulative impacts to soil "result from repeated activity disturbance of the same ground." (*See* Cook Decl. ¶ 10.) Thus, the Forest Service determined that it need not consider present and future projects, as these projects were not expected to impact the same ground. (Def. Mem. at 25.) In addition, as current soil conditions reflect the impact of past activities, the Forest Service determined that it could analyze the effects of past logging projects through an analysis of current soil conditions. (*See* AR 308—315; 357–60; Cook Supp. Decl. ¶ –15 [stating that all Phase 1 units "were inspected by experienced earth scientists with substantial soils expertise"].) The evidence before the Court does not suggest that these agency decisions were clearly erroneous. Nor does the record suggest that the Forest Service failed to take a hard look at the impact to soils. (*See* AR 314–15, 338, 357–360, 7301–36, 3144–45.). Rather, the record and evidence submitted by the Forest Service demonstrates that the EIS contains a "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *See Neighbors of Cuddy Mountain,* 137 F.3d at 1376.

Accordingly, the Court concludes that the EIS contains a reasonably thorough analysis of the cumulative impact on soils.

c. *Fuel Break Strategy and Maintenance*

■ Plaintiffs assert that the EIS fails to sufficiently assess the environmental impacts of the necessary maintenance for the proposed permanent fuel break network. Although Appendix B to the EIS states that fuel breaks will have to be maintained "every 2–10 years depending how quickly brush returns," the EIS does not disclose how the fuel breaks will be maintained and

does not analyze the environmental impacts of the required maintenance. (*See* AR 413, 422, 360–368.) Relying on *Californians for Alternatives to Toxics v. Dombeck,* No. Civ. S–00–605 LKK/PAN (E.D. Cal., June 12, 2001), plaintiffs assert that the EIS violates NEPA by failing to analyze the environmental impacts of maintaining the fuel breaks, as such maintenance is reasonably foreseeable and necessary for the success of the fuel break strategy. *See id.* at 28 (holding EIS inadequate where Forest Service failed to consider environmental impact of fuel break maintenance).

■ The Forest Service asserts that it was not required to analyze the effects of maintenance because "evaluation of the cumulative effects of the maintenance of fire breaks [is] premature and speculative." (*See* Def. Mem. at 27.) Specifically, the Forest Service contends that "when or what individual units would require maintenance are unknown" and "scientific thinking and agency priorities regarding different maintenance treatments could change significantly, or another wildfire could irrevocably change site conditions" before maintenance is required. (*See id.*) This argument is not persuasive. While scientific thought and agency priorities are always subject to change, the necessity of maintenance is not so speculative or unforeseeable that analysis of its effects can reasonably be deferred to a later date. *See* 40 C.F.R. § 1508.7 (requiring that EIS consider reasonably foreseeable future actions). To the contrary, the record indicates that the Forest Service considers maintenance a necessary part of the fuel break project. *See* AR 9398 ("Because of the environmental dynamics and long-term use and strategic nature of fuelbreaks, a maintenance and reburn schedule is necessary to keep fuel loading and canopy closure at required standards. Indefinite maintenance of the fuel breaks to ensure low fuel conditions is essential.") As fuel

break maintenance is necessary and foreseeable, the effects of such maintenance must be addressed within the EIS. *See Save the Yaak Committee v. Block*, 840 F.2d 714, 720 (9th Cir.1988) ("[A]n EIS must cover subsequent phase of development when '[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase, if subsequent phases were not also undertaken.'"); *Blue Mountains*, 161 F.3d 1208, 1214–15 (9th Cir.1998) (requiring EIS to consider five related timber sales where actions part of one recovery strategy and were reasonably foreseeable); 40 C.F.R. § 1508.7 (requiring that EIS consider reasonably foreseeable future actions); *Cf. Wetlands Action Network v. United States Army Corps*, 222 F.3d 1105, 1119 (9th Cir.2000) (holding EIS did not need to consider subsequent phases of project where "impractical" to do so because subsequent phases had not received approval and many planning decisions had not been made).

Accordingly, the Court concludes that the EIS's failure to adequately disclose and analyze the environmental impacts of fuel break maintenance violates NEPA.

d. *1999 Fire–Fighting and Fire-suppression Tactics*

 Plaintiffs assert that the Phase 1 EIS violates NEPA by failing to account for the impact of the Forest Service's 1999 fire-fighting tactics, including the use of chemical fire retardants and firelines,[9] within its cumulative effects analysis.[10]

In response, the Forest Service does not contend that it disclosed or analyzed the effects of prior firefighting tactics. Rather, the Forest Service argues that the firelines were not analyzed because the firelines were "rehabilitated" to "reduc[e] the likelihood of erosion and sedimentation." (*See* Cook Decl. ¶ 28; AR 471 [describing rehabilitation].) The Forest Service fails, however, to cite to any portion of the record demonstrating that the agency chose not to address the cumulative effects of firelines for this reason. Nor does the Forest Service explain why "reducing" the effects of the firelines eliminates the Forest Service's responsibility to consider their cumulative impacts. Even if the firelines had only a small impact, "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. 1508.7 Further, the Forest Service fails to explain how such post-fire "rehabilitation" could eliminate the effects from the construction and existence of the firelines. As plaintiff's expert demonstrated, and the Forest Service does not dispute, "[f]irelines cause significant and persistent reductions in soil productivity via elevated

9. Specifically, plaintiffs contend that the Forest Service failed to analyze the "fifty miles of bull-dozed firelines, 100 miles of constructed hand-lines, 280 tons of chemical fire retardant, the logging of 'hazard' trees, and the construction of safety zones and helicopter landing, all of which occurred during the 1999 fire-fighting operations within the analysis area." (Reply at 20.)

10. Plaintiffs' position finds some support in the record of the administrative appeal. On July 9, 2001, plaintiffs filed an administrative appeal of the Forest Service's decision to implement the Phase 1 project. Plaintiffs' claims were first reviewed by the Forest Service's "Appeal Reviewing Officer," who prepared a recommendation for the "Appeal Deciding Officer." (*See* AR 3845, 3848, 3844). The Appeal Reviewing Officer found it "inexcusable" for the EIS not to address the impacts of firelines and recommended that the decision approving Phase 1 logging be reversed "with added instructions to do the correct baseline analysis." *See* AR 3852 ("[N]ot analyzing firelines which have a potential to route and produce sediment within the Cumulative Effects Analysis ... is inexcusable.") The Appeal Deciding Officer rejected this recommendation and affirmed the Forest Service's decision to implement Phase 1. *See* AR 3843–44.

erosion, compaction and the removal of all organic matter, which is critical to soil productivity." (*See* AR 3772 [Rhodes Declaration] ¶ 18.) Such significant effects must be disclosed within the EIS. *See City of Carmel*, 123 F.3d at 1160 (holding that EIS must "provide [a] useful analysis of the cumulative impacts of past, present and future projects.").

■ The Forest Service also asserts that the "omission of the fire lines and firefighting activities was a technical deficiency that does not meaningfully change the disclosure of effects of the project in the FEIS." (*See* Def. Reply at 15.) A "technical deficiency" is an omission that does not "frustrate" NEPA's twin goals of ensuring that the "decision-maker was otherwise fully informed as to the environmental consequences" of the proposed action and that "members of the public had sufficient information" with respect to the omitted topic. *See Laguna Greenbelt v. Department of Transportation*, 42 F.3d 517, 527 (9th Cir.1994).

■ In support of its position that the omission of firelines was merely a technical deficiency, the Forest Service relies on declarations submitted by Carolyn Cook ("Cook"), a Forest Service Hydrologist, in which she analyzes the impacts of the firelines and states that including an analysis of firelines would not have altered the conclusions reached in the EIS. (*See* Cook Decl. ¶¶ 29–30; Cook Supp. Decl.

¶ 8.) The Court, however, cannot rely on Cook's data and conclusions to cure deficiencies within the EIS, as her studies were not a part of the administrative record and were not before the decisionmaker at the time the decision was made.[11] *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). Further, even if the Forest Service would not have altered its conclusions if the effects of the firefighting tactics were analyzed within the EIS, failure to conduct and disclose such analysis is not a mere "technical deficiency," as this failure denied the public the opportunity to comment on or challenge the analysis during the administrative process. *See Laguna Greenbelt*, 42 F.3d at 527. As the fire-fighting tactics were not fully disclosed or analyzed within the EIS, "neither the courts nor the public, in reviewing the Forest Service's decision[ ], can be assured that the Forest Service provided the hard look that it is required to provide." *See Neighbors of Cuddy Mountain*, 137 F.3d at 1380.

With respect to the chemical fire retardant used to suppress the 1999 fires, the Forest Service contends that the EIS "reasonably did not contain cumulative effects from fire retardant" because "any effects from [fire retardant] would have been ap-

---

11. Plaintiffs filed a Motion to Strike Cook's declaration, asserting that the declaration contains impermissible, extra-record evidence that may not be considered by this Court. Specifically, plaintiffs contend that the Court should strike paragraph 29, in which Cook presents data explaining the impact of including the firelines in the agency's cumulative watershed effects analysis; paragraphs 19 and 20, in which Cook provides a calculation regarding whether the challenged logging project will met an applicable forest plan soil standard; and paragraph 18, in which Cook

states that the project area has "non-cohesive dioritic soils" that, in the agency's "experience," do not compact as easily as other soils. Plaintiffs assert that these portions of Cook's declaration constitute post hoc rationalizations for agency action and therefore must be striken. The Court agrees. *See Alvarado Community Hospital v. Shalala*, 155 F.3d 1115, 1124 (9th Cir.1998) ("[E]xplanatory materials cannot be used to offer new rationalizations for agency action.") Accordingly, plaintiffs' motion to strike said paragraphs of Cook's declaration is hereby GRANTED.

parent at the outset of the project's analysis." (*See* Def. Mem. at 29; Def. Reply at 15.) The Forest Service has failed, however, to cite to any support in the record for this position. The Forest Service also contends that "plaintiffs have failed to allege what, if any, effects [the use of fire retardant] had within the project area." (Def. Mem. at 29.) NEPA, however, places the duty to analyze cumulative effects on the Forest Service, not the plaintiffs. *See City of Carmel*, 123 F.3d at 1161 (holding agency violated NEPA by failing to analyze cumulative impacts even where plaintiff failed to allege effect of such deficiency).

Accordingly, the EIS violates NEPA by failing to disclose the impacts of the firefighting tactics.

### 3. Post–Fire Projects: Single EIS Requirement

 Plaintiffs assert that the Forest Service failed to analyze the impacts of all "connected, cumulative, and similar postfire projects within a single EIS." (*See* Pl. Mem. at 27.) "[A]n agency is required to consider more than one action in a single EIS if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'" *See Northwest Resource Info. Ctr. v. National Marine Fisheries Service*, 56 F.3d 1060, 1067 (9th Cir.1995).

#### a. *Connected Actions*

 Plaintiffs assert that the Phase 1 and Phase 2 projects are connected actions and, thus, must be considered together within a single EIS.[12] "Actions are connected if they: (i) Automatically trigger other actions which may require environmental impact statements. (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. 1508.25(a)(1). In plaintiff's review, Phase 1 and Phase 2 are "interdependent parts of a larger action and depend on the larger action for their justification." *See id.*

The Forest Service contends that Phase 1 and Phase 2 are not connected, but rather are complementary actions with "independent utility." *See* Def. Reply at 19. The Court agrees. While Phase 1 and Phase 2 are both part of the "overall strategy to protect communities from wildfires and extended exposure to smoke and to restore affected watersheds," (*see* AR 258), the record demonstrates that Phase 1 and Phase 2 apply to different parts of the forest and could each be implemented independently. *See* (Woltering Decl. ¶ 8; AR 258.) The Court concludes, therefore, that the Phase 1 and Phase 2 project are not connected actions. *See Western Radio v. Glickman*, 123 F.3d 1189, 1195 (9th Cir. 1997) (holding tower and access road for tower not connected actions where tower could function independently of road).

#### b. *Cumulative Actions*

 Plaintiffs assert that other logging projects proceeding within Six Rivers are cumulative actions that must be disclosed within a single EIS. Cumulative actions are actions "which when viewed with other proposed actions have cumulatively significant impacts" on the environment. *See* 40 C.F.R. § 1508.25(2). "Significance cannot be avoided by ... breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7).

---

12. Plaintiffs' contention is supported by the Environmental Protection Agency ("EPA"), which stated, during the comment period, that "it is unclear why the Forest Service has chosen to separate Phase 1 and Phase 2" and recommended that "connected actions ... proposed for the same watershed" be analyzed together within the same EIS. *See* AR 994.

"The NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS." *See City of Tenakee Springs,* 915 F.2d at 1312; *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) ("When several proposals for ... related actions that will have cumulative or synergistic environmental impacts upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action."); *Blue Mountains,* 161 F.3d at 1215 (requiring actions to be considered in single EIS where the proposed actions were reasonably foreseeable and were developed as part of a comprehensive forest recovery strategy).

According to plaintiffs, although the Forest Service's recovery strategy included several post-fire logging projects for the areas "impacted by the Big Bar Complex Fires," the Forest Service impermissibly prepared separate NEPA analyses for each project, rather than preparing a single EIS. (*See* Pl. Mem. at 28.) Specifically, plaintiff asserts that the following projects are cumulative actions that should have been identified and analyzed within the EIS: (1) the "Megram Roadside Hazard Tree Project;" (2) the "Happy Plantation Project;" (3) the "Phase 1" and "Phase 2" logging projects; (4) the "Plantation Precommericial Thinning, Release, and Fuels Treatment project;" and (5) the "Plantation Planting, Site Preparation, and Fuels Treatment project." (*See* Pl. Reply at 26.)

▆▆▆ In response, the Forest Service asserts that the EIS should be upheld because plaintiffs have failed to meet their burden to prove that the projects they

identified have cumulative significant impacts. (*See* Def. Reply at 22.) The Forest Service, however, cannot shift to plaintiffs the responsibility of proving cumulative impact. *See City of Carmel,* 123 F.3d at 1161 (holding agency had burden to "describe other area projects [and] detail the cumulative impacts of these projects"); *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975) ("Compliance with [NEPA] is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs.")

Further, the evidence submitted by plaintiffs is sufficient to raise substantial questions about whether the identified projects will result in cumulative impacts. *See Blue Mountains,* 161 F.3d at 1215 (holding single EIS required where five foreseeable logging projects undertaken as part of comprehensive forest recovery raised "substantial questions" about whether the projects would result in cumulatively significant impacts). Specifically, plaintiffs have demonstrated that the Forest Service, through the "Megram Roadside Hazard Tree Project," is currently logging trees along 114 miles of Forest Service roads throughout the Megram Fire area, including roads within or adjacent to the Phase 1 project area. (*See* Fink Dec. Ex. G; Christine Ambrose Decl. Ex. 4.) In addition, the "Happyman Plantation Project" logged 191 acres of severely burned areas, including timber harvest units adjacent to Phase 1 units.[13] (*See* Fink Dec. Ex. K). The "Plantation Precommercial Thinning, Release, and Fuels Treatment project" and the "Plantation Planting, Site Preparation, and Fuels Treatment project" are additional logging projects occurring within the "Lower Trin-

13. Although plaintiffs also assert that "the Phase 1 and Phase 2 projects have analysis areas that overlap," no support is cited for this proposition.

ity Ranger District," the same ranger district for which the Phase 1 project is proposed.[14] (*See* Fink Dec. Ex. J, L; AR 236.) In addition, plaintiff has demonstrated that at least the Happyman Project and the Phase 2 project are part of a comprehensive fire recovery strategy. (*See id.* Ex. K at 5, AR 258.) Given their similarities with respect to timing, geography and purpose, these actions "raise substantial questions that they will result in significant environmental impacts" and such impacts must be addressed in a "single EIS." *See Blue Mountains,* 161 F.3d at 1215.

 The Forest Service also asserts that the EIS should be upheld because "Forest Service's resources managers are in the best position to determine whether the Fuels Projects is cumulative with any or all of the other five projects identified by Plaintiffs, and they have found in the negative." (Def. Mem. at 36.) While the Court agrees that "the determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency" of the Forest Service, no cited portions of the record demonstrate that the Forest Service made a determination with respect to the extent and effect of cumulative impact factors. *See Kleppe,* 427 U.S. 390, 414, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Absent such, the Court cannot be assured that the Forest Service took a "hard look" at the potential cumulative impacts of these projects. *See Vermont Yankee,* 435 U.S. at 535, 98 S.Ct. 1197 (holding court must insure that agency took "hard look" at environmental effects of proposed action).

 The Forest Service asserts that the Phase 1 project is not cumulative with the projects identified by plaintiff, and, in any event, that the EIS discloses all relevant and foreseeable cumulative effects through its cumulative watershed effects analysis ("CWE"). (Def. Mem. at 34.) The portions of the record cited by defendant, however, do not support this assertion. (*See* AR 3150 [stating that the Happy Man Plantation Project was "accidentally overlooked" and that the "Hazard Tree removal project was not considered" the CWE].) Further, as noted by plaintiffs, CWE analysis does not address impacts to such forest resources as wildlife and soils. Thus, the CWE alone does not provide the overall assessment of cumulative actions required by NEPA. *See City of Tenakee Springs,* 915 F.2d at 1312 ("The NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS.")

 Finally, the Forest Service argues that plaintiffs failed to "request the specific listings of projects considered in the FEIS' cumulative effects analyses in their comments regarding the DEIS." [15] (Def. Mem. at 34.) Plaintiffs, however, stated in their comments to the DEIS that they "believe that the proposed actions are only a small part of all connected and similar actions that need to be addressed, including all components of the Megram Recovery Strategy, fuel break strategy, and fire suppression." *See* AR 913. Further, the EPA also requested

---

**14.** The Forest Service states that the " 'Plantation Precommercial Thinning, Release and Fuels Treatment' and 'Plantation Planting, Site Preparation and Fuels Treatment' are not ground disturbing activities." The Forest Service, however, fails to cite any support for

this assertion or explain its significance. (*See* Def. Mem. at 35.)

**15.** The "DEIS" is the Draft Environmental Impact Statement which was released to the public for comments.

"that the Introduction chapter include a summary of all projects to be undertaken pursuant to the Megram Fire Recovery Strategy, along with project timelines, anticipated NEPA documentation, and a frank discussion of the likelihood that subsequent projects will be funded." (*See* AR 994.) The Forest Service cannot argue, therefore, that it was not placed on notice of plaintiffs' objections during the notice and comment period. In addition, the Forest Service has a duty to address cumulative action regardless of whether plaintiffs complain of violations. *See Northwest Environmental Defense Center v. Bonneville Power Administration,* 117 F.3d 1520, 1534–35 (9th Cir.1997) (stating Ninth Circuit has "not establish[ed] a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision;" holding judicial review proper where plaintiff failed to raise objection during public comment process, because agency has duty to comply with regulation "regardless of whether participants complain of violations."). *Cf. Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991) ("Absent exceptional circumstances, [concerns raised after final EIS issued] may not form a basis for reversal of an agency decision.")

Accordingly, the Court concludes that the Forest Service has failed to adequately disclose and consider cumulative actions in the EIS.

### c. Similar Actions

■■■ Similar actions are defined as actions "which when viewed with other reasonably foreseeable or proposed agency action, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3). Here, the Forest Service does not dispute that the actions identified by plaintiffs share "common timing and geography." [16] Rather, relying on the language of § 1508.25, [17] the Forest Service argues that it is not required to consider similar actions within a single EIS. The Ninth Circuit, however, has held that similar actions must be addressed within a single EIS. *See Northwest Resource Info. Ctr.,* 56 F.3d at 1067 ("[A]n agency is required to consider more than one action in a single EIS if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'")

Accordingly, the Court concludes that the Forest Service has failed to adequately disclose and consider similar actions within the EIS.

### B. Violation of NFMA

■■■ Plaintiff asserts that the EIS violates NFMA by failing to demonstrate

---

**16.** Plaintiff asserts that the following projects are similar actions that should have been identified and analyzed within the EIS: (1) the "Megram Roadside Hazard Tree Project;" (2) the "Happy Plantation Project;" (3) the "Phase 1" and "Phase 2" logging projects; (4) the "Plantation Precommericial Thinning, Release, and Fuels Treatment project;" and (5) the "Plantation Planting, Site Preparation, and Fuels Treatment project." (*See* Pl. Reply at 26.)

**17.** 40 C.F.R. § 1508.25 states: "To determine the scope of environmental impact statements, agencies *shall* consider 3 types of ac-

tions, 3 types of alternatives, and 3 types of impacts." *See id.* (emphasis added). Section 1508.25 lists the three types of actions: "connected actions," "cumulative actions," and "similar actions." With respect to similar actions, § 1508.25 states: "An agency *may* wish to analyze these actions in the same impact statement. It *should* do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement." *See id.* (emphasis added). Concededly, § 1508.25 is not a model of clarity.

compliance with the Six Rivers National Forest Plan's ("Forest Plan") standards and guidelines regarding direct impact on soils. Under NFMA, the Forest Service "must demonstrate that site-specific project would be consistent with the land resource management plan of the entire forest." *See Neighbors of Cuddy Mountain,* 137 F.3d at 1377; 36 C.F.R. § 219.10(e).

■ The Forest Plan requires that, "[f]or each timber harvest unit, soil porosity [be] maintained to at least 90 percent of its natural condition over at least 85 percent of the project area." AR 6532. Plaintiffs assert that the Forest Service fails to disclose or demonstrate compliance with this standard, as the "EIS does not disclose the existing conditions of soil porosity for each timber sale unit, or discuss the potential impacts of the proposed project to soil porosity." (*See* Pl. Reply at 30.) The Court agrees. To demonstrate compliance with the Forest Plan's requirements, the Forest Service would have to show that, after the Phase 1 project was complete, soil porosity would be maintained in compliance with the Forest Plan's specifications. *See Neighbors of Cuddy Mountain,* 137 F.3d at 1377–78 (holding EIS inadequate where EIS failed to demonstrate compliance with Forest Plan). The Forest Service has failed to do so. In fact, the Forest Service admits that "soil porosity or compaction was not explicitly assessed in detail in the FEIS." *See* Cook Decl. ¶ 18. In explanation, the Forest Service relies on the declaration of Cook, who states that the potential for compaction was not considered "significant" because "experience" indicated that the type of soil underlying most of the project area "do[es] not readily compact to the detriment of re-growth potential." *See id.* The record, however, does not contain any data or analysis to support Cook's opinion nor is the opinion disclosed within the EIS. *See Idaho Sporting Congress,* 137 F.3d at 1150 (holding agency may not rely on expert opinion without disclosing hard data supporting opinion to the public.) The Forest Service may not cure deficiencies within the EIS by providing post hoc explanations that are neither addressed nor supported in the record. *See Citizens to Preserve Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."); *Alvarado Community Hospital,* 155 F.3d at 1124 ("[E]xplanatory materials cannot be used to offer new rationalizations for agency action.") Consequently, the EIS violates NFMA by failing to demonstrate that the project complies with the Forest Plan's requirements as to soil porosity.

■ Plaintiffs next assert that there is insufficient evidence within the EIS or the administrative record to demonstrate that the Forest Service conducted "unit-by-unit," site-specific investigations of the individual timber harvest units. (*See* Pl. Reply at 32.) In support, plaintiffs rely on the declaration of their expert, George Badura, who states that, "[a]s far as can be determined from the Phase 1 FEIS, nowhere were the site, units, or soils individually evaluated by soils personnel for current conditions ... to determine needs to meet the standards and guidelines or the applicable laws and regulations." (*See* Badura Decl. ¶ 9.) The EIS indicates, however, and a declaration submitted by the Forest Service confirms, that the Forest Service conducted site-specific analysis of the proposed harvest units encompassed in the Phase 1 project. (*See* Cook Supp. Decl. ¶ 15) (stating "all units were inspected by experienced earth scientists with substantial soils expertise"); AR 334–335 (indicating analysis of environmental effects based on field inspection), AR 428–430 (identifying harvest unit specific fuel treatment proposals).

■ Lastly, plaintiffs contend that the EIS fails to demonstrate compliance with the Forest Plan in that it does not assess the negative, long-term impacts on soil organic matter and nutrients of removing trees from the project area. The Forest Plan requires that "the upper 12 inches of soil [be] at least 85 percent of the total soil organic found under undisturbed conditions for the same or similar soils." *See* AR 6763. Here, the EIS compared the level of soil cover expected after each treatment alternative, including the "No Action Alternative," and concluded that "it is very unlikely that the fuel treatments would collectively lower the overall productivity of these soils (in terms of vegetation and other resource values they support) by more than a few percent in the short or long term." *See* AR 359. The Court concludes, therefore, that the EIS adequately demonstrated compliance with the Forest Plans requirements with respect to soil organic matter.

Accordingly, the EIS violates NFMA by failing to demonstrate compliance with the Forest Plan directive with respect to soil porosity but complies with NFMA in all other respects.

## C. Injunctive Relief

■ Plaintiffs assert that implementation of the Phase 1 Logging Project should be enjoined until the Forest Service prepares an EIS that complies with the requirements of NEPA and NFMA. In determining whether to issue an injunction where an agency has failed to comply with environmental laws, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *See Amoco Production Company v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). "[A]n injunction is an equitable remedy that does not issue as a matter of course." *See id.* Even where an agency has failed

to comply with an environmental statute, "a federal judge ... is not mechanically obligated to grant an injunction for every violation of law." *See id.* (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

■ Here, plaintiffs have demonstrated that the environment may suffer irreparable harm if an injunction is not issued and logging commences prior to the completion of an adequate EIS. *See Portland Audubon Society v. Lujan,* 795 F.Supp. 1489, 1509 (D.Or.1992) ("Courts in this circuit have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures and other environmental laws."); AR 3780 ("There is considerable evidence that persistent, significant adverse environmental impacts are likely to result from salvage logging.") Although the Forest Service asserts that the environment may suffer harm if Phase 1 is not implemented, neither the Court nor the Forest Service can assess the likelihood of such harm until a complete EIS is prepared.

The Forest Service contends that it must begin Phase 1 immediately to reduce the risk that surrounding communities would be placed in danger by another catastrophic wildfire. The Forest Supervisor admits, however, that there is no significant risk of another intense wildfire within the next five years. (*See* Woltering Decl. ¶ 13). While small wildfires can start at any time, the Phase 1 project area currently contains insufficient fuels to create an intense wildfire. *See* AR 359 (stating that risk of intense fire "is not high at present, but in 5 to 10 years the risk would be considerably greater as fuels build up in these units.") In fact, implementation of the Phase 1 project may actually increase fire risk in the short-term. *See* AR 305 ("The No Action alterative would have the

lowest hazard in the short-term"); Fink Dec. Ex. D [Everett Report] at 5 ("Current research ... suggests that salvage logging areas may have elevated fire hazard over tree retention sites for the first 20 + years, but retention sites would have elevated fire hazard from then into the future.") Thus, the Forest Service has failed to demonstrate that it would be unable to prepare an adequate EIS and implement its plan before communities are placed at risk of an intense fire.[18]

In light of the potential for detrimental effects on the environment and the unlikelihood that the Forest Service or public will suffer harm during the pendency of an injunction, plaintiffs are entitled to an injunction prohibiting implementation of the Phase 1 project until the Forest Service prepares an adequate EIS.

## CONCLUSION

For the reasons stated, the Court rules as follows:

1. Plaintiffs' Motion for Summary Judgment is hereby GRANTED and defendant's Motion for Summary Judgment is hereby DENIED.

2. Defendant is hereby ENJOINED from any further-implementation of the Phase 1 logging project on the Six Rivers National Forest pending the completion of a Supplemental Environmental Impact Statement that meets the requirements of NEPA and NFMA.

This order terminates Docket Nos. 21, 29, and 36.

The Clerk shall close the file.

**IT IS SO ORDERED.**

---

18. Although the Forest Service asserts that it may take "several years" to prepare an adequate EIS, the record demonstrates that the current EIS was prepared in less than nine months. *See* AR Index 4–6 (stating that the Forest Service filed a Notice of Intent to prepare the Phase 1 EIS on October 23, 2000, completed the Draft EIS on March 16, 2001, completed the Final EIS on June 8, 2002, and completed the Record of Decision on July 9, 2001.)