**TRINITY RIVER LUMBER CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Hagen & Sons, Plaintiff,**

v.

**The United States, Defendant.**

Nos. 02–943C, 02–944C.

United States Court of Federal Claims.

June 20, 2005.

Gary G. Stevens, Washington, D.C., for plaintiffs. Ruth G. Tiger and Michael J. Wade, of counsel.

Reginald T. Blades, Jr., Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom on the briefs were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, for defendant. James L. Rosen, of counsel.

## OPINION

BRUGGINK, Senior Judge.

This is an action for breach of contract. Plaintiffs, Trinity River Lumber Co. ("Trinity") and Hagen & Sons ("Hagen"), allege that the United States Forest Service ("Forest Service") breached contracts for the sale of timber. Pending are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").

Plaintiffs' motion addresses Counts I, II, and IV of the amended complaint.[1] Count I alleges that the Forest Service breached the timber sale contracts by failing to permit plaintiffs to cut and remove all catastrophe-affected timber meeting utilization standards in their sale areas that could have been har-

---

1. Plaintiffs' motion does not address Count III. Count III deals with compensation for out-of-pocket expenses pursuant to clause C6.01 of the contracts. The parties have opted to defer a ruling on Count III until a later time. Count V, the only other count, was dismissed with prejudice pursuant to RCFC 41(a)(1) at the request of the parties.

vested consistent with environmental standards. Count II alleges that the Forest Service's failure to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370 (2000), and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1640 (2000), breached the implied contractual duties to cooperate and not to hinder performance. In Count IV, plaintiffs claim that defendant should pay plaintiffs for the lost value resulting from the deterioration of the catastrophically-affected timber.

Defendant cross moves as to the same counts. It asks the court to find that the Forest Service modified the contracts in a timely and appropriate manner; that following modification, the Forest Service properly suspended the contracts; and that plaintiffs are not entitled to compensation for unharvested deteriorated timber.

The case was transferred to the undersigned on December 15, 2004. Oral argument was held on March 11, 2005. Following oral argument, the court requested that the parties file supplemental briefs. For the following reasons, we grant defendant's cross-motion as to Count IV, as well as a portion of its motion with respect to Count I. The parties' cross-motions are denied in all other respects.

## BACKGROUND

Severe winter storms in 1995 and 1996 caused extensive tree damage to approximately 30,000 acres of Six Rivers National Forest ("Six Rivers"). This resulted in a large number of dead and dying trees and a greatly increased risk of fire. In 1997, the Forest Service developed a project to reduce the risk of fire by eliminating damaged, dead, or dying trees. To implement the project, the Forest Service entered into contracts for the sale of timber within certain areas of Six Rivers.

On July 30, 1998, the Forest Service awarded plaintiff Hagen contract No. 056716 for harvesting timber in a 306–acre area known as Griz. Hagen agreed to pay $133,500. The termination date was March 31, 1999. On August 4, 1998, the Forest Service awarded plaintiff Trinity contract No. 056724 for harvesting in a 204 acre area known as West Lone Pine ("WLP"). Trinity agreed to pay $158,044. That contract had a termination date of March 31, 2000. The prices listed in the contracts were based on the estimated volume of timber in each area. Actual payments would be based on the volume removed. The contracts did not cover all of the timber within the Griz and West Lone Pine sale areas. Each sale area contained interspersed "harvest units." Within those harvest units, certain timber was designated for cutting. Only this "designated timber" could be removed.

Plaintiffs started harvesting and removed most of the designated timber. But in the late summer and early fall of 1999, before they could finish, a wildfire, now known as the Megram Fire, burned over 120,000 acres of the Six Rivers and Shasta–Trinity National Forests in California. The Megram Fire burned through Griz and WLP on approximately September 28, 1999, causing extensive damage. Shortly after the Megram Fire, the Forest Service suspended operations on the sale to assess the fire's impact.[2] The parties agree that the Megram Fire caused catastrophic damage to both the Griz and WLP sale areas within the meaning of clause B2.133 ("Damaged by Catastrophe") of the contracts.

Among the Forest Service's responses was the establishment of two assessment teams: one team to perform an environmental analysis to remove hazard trees along the roads accessing burned areas ("roadside hazard trees"); another team to assess the effect of the Megram Fire upon the WLP and Griz sale areas.

In April 2001, following an environmental analysis and pursuant to clause B8.33 ("Modification for Catastrophe"), the parties modified the contracts so that plaintiffs could remove identified roadside hazard trees. They were removed from the WLP sale area by June 8, 2001, and from the Griz sale area by September 12, 2001.

2. The Forest Service repeatedly extended the termination dates of the contracts to assess the damage caused by the Megram Fire. Ultimately, both contracts were extended to October 1, 2000.

As to other timber, the Forest Service announced to the public in October 2000 that it intended to prepare an Environmental Impact Statement ("EIS") for Phase I of the "Fuels Reduction for Community Protection" project ("Phase I"). Phase I would encompass most of the WLP and Griz sale areas, as well as a much larger area. The purpose would be to identify burned timber for salvage logging with the ultimate goal of protecting communities from wildfires. The Forest Service issued the EIS in June 2001, and the record of decision was signed on July 9, 2001. The same day the record of decision was signed, plaintiffs' contracts were modified again. The modifications added to the contracts a portion of the burned timber within the sale areas. Plaintiffs began operations to remove the additional timber immediately.

Also on July 9, 2001, the Sierra Club and other environmental groups filed an administrative appeal with the Forest Service contesting the sufficiency of the EIS. Administrative appeals typically trigger automatic administrative stays of harvesting operations. This did not stop plaintiffs' harvesting operations, however, because the Forest Service had issued, prior to the administrative appeal, an "Emergency Situation Determination and Exemption from Stay" ("ESD") which exempted Phase I from automatic administrative stays. The next day, the environmental groups also filed suit in the United States District for the Northern District of California seeking injunctive relief to stop implementation of Phase I, including harvesting of burned timber by plaintiffs in the WLP and Griz sale areas. In response to the suit, Trinity and Hagen voluntarily suspended operations for forty-eight hours.

On July 12, 2001, the district court issued a temporary restraining order enjoining the Forest Service from taking any action under Phase I. The contracting officer issued two identical letters to plaintiffs on July 19, 2001, notifying them that "to comply with the court order, under contract provision *C6.01–Interruption or Delay of Operations*, this letter serves as your written notice to cease all operations under this contract."

On the same day that it issued the letters notifying plaintiffs of the C6.01 suspensions, the Forest Service also withdrew the ESD, and the project was placed under the Forest Service's appeals regulations. The effect of this was an automatic administrative suspension of the project while the appeal was resolved. This resulted in the environmental groups withdrawing their court action. Consequently, the suit was dismissed without prejudice.

On October 4, 2001, the Forest Service denied the administrative appeal and affirmed the decision to proceed with Phase I. On October 17, 2001, however, environmental groups filed a new complaint, seeking injunctive relief to prevent implementation of the project. *See Sierra Club v. Bosworth,* 199 F.Supp.2d 971 (N.D.Cal.2002). On October 19, 2001, in accordance with the stipulation of the district court parties, the court enjoined the Forest Service from taking any action on Phase I until March 15, 2002. On October 26, 2001, the Forest Service issued a letter to Trinity notifying it of the second restraining order: "[I]n accordance with Contract Provision *C6.01* ... this letter serves as written notice that 'any further cutting, logging, or removing of logs from the project area ... until March 15, 2002' ... is suspended in accordance with this second temporary restraining order." [3]

Trinity filed a Contract Disputes Act ("CDA") claim with the contracting officer on November 29, 2001. It alleged that the Forest Service's suspensions of the contract constituted a breach, for which it was entitled to $6,286,737.12, plus interest. The parties agree that the catastrophe-affected timber became commercially worthless by December 2001. Hagen filed a similar CDA claim on April 1, 2002, asking for $4,897,997.25 in damages and out-of-pocket expenses.

On April 17, 2002, the district court granted the environmental groups' motion for

---

3. It is not clear whether a similar letter was sent to Hagen. It is also unclear whether this prevented plaintiffs from conducting logging operations between March 15, 2002 and April, 17, 2002, the date of the district court's permanent injunction. Resolution is unnecessary, however, because it ultimately would be immaterial to the issues presented by the motions.

summary judgment and permanently enjoined the Forest Service from implementing Phase I, pending completion of a supplemental EIS meeting the requirements of NEPA and NFMA. *Id.* The court held that the original EIS violated NEPA because it failed to: (1) disclose and analyze scientific opinion in support of and in opposition to the conclusion that Phase I would reduce the intensity of future wildfires in the project areas; (2) disclose scientific opinion that opposed post-fire logging; (3) adequately disclose and analyze cumulative impacts on management indicator species; (4) adequately disclose and analyze the environmental impacts of fuel-break maintenance; (5) disclose the environmental impact of the fire-fighting tactics used to combat the Megram Fire; (6) analyze the environmental impact of all cumulative post-fire actions in a single EIS; and (7) adequately disclose and consider the impact of similar actions within a single EIS. *Id.* at 981–90. The court also held that the EIS did not comply with the NFMA because it failed to assess the project's impact on soil porosity. *Id.* at 991.

The Forest Service denied Trinity's CDA claim on May 9, 2002, and Hagen's CDA claim on July 11, 2002.

On August 6, 2002, the district court entered an amended final judgment, stipulated to by the district court parties, requiring the Forest Service to terminate any timber sale contracts associated with Phase I. On December 16, 2002, the Forest Service terminated plaintiffs' contracts citing the district court order and provision C8.2 of the contracts.

Plaintiffs filed their complaints here on August 6, 2002. The cases were later consolidated. Plaintiffs are seeking damages for breach of contract (Count I) and breach of the implied duties to cooperate and not to hinder (Count II). Plaintiffs also claim that they are entitled to compensation for the value of the deteriorated timber under the express terms of the contract (Count IV).

**4.** Utilization standards are the minimum size and quality required for timber to be harvested in a

## DISCUSSION

### I. *Included Timber*

■ The contracts allow only the harvesting of "included" timber, as that term is defined by B2.133. Plaintiffs contend in Count I that defendant breached the timber sale contracts by not allowing plaintiffs to harvest all included timber in the Griz and WLP sale areas. They argue that when undesignated timber within the sale area (i.e., timber not identified for harvesting) meeting utilization standards[4] was damaged by fire, it automatically became "included timber" under clause B2.133 and the Forest Service was obligated to allow plaintiffs to harvest all such timber.

Defendant counters that catastrophe-damaged timber only becomes included timber if the parties reach agreement after consultation. Such consultation occurred here, it contends, and only the agreed-upon timber was added to the contracts.

Plaintiffs' timber sale contracts are virtually identical, differing only as to the purchase price and areas to be harvested. Both provide that "unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber." "Included Timber" is defined by clause B2.1 of the contracts. It states:

> **B2.1 Included Timber.** "Included Timber" consists of:
>
> **B2.11 Standard Timber.** Live or dead trees and portions thereof which meet Utilization Standards under B2.2 and are designated for cutting under B2.3.
>
> **B2.12 Substandard Timber.** Live and dead trees which (a) do not meet Utilization Standards and (b) are located in Clearcutting Units or construction clearings or are otherwise designated for cutting.
>
> **B2.13 Damaged Timber.**
>
> . . . .

sale area.

**B2.133 Damaged by Catastrophe.** As provided under B8.33, undesignated live and dead timber within Sale Area, meeting Utilization Standards, and affected by Catastrophic Damage.

The last paragraph above, B2.133, is pertinent here. Clause B8.33, which it references, provides:

**B8.33 Modification for Catastrophe.** In event of Catastrophic Damage, Forest Service, in consultation with Purchaser, shall outline on Sale Area Map: (a) any areas of catastrophe-affected live and dead timber meeting Utilization Standards [5] and having undesignated timber so situated that it should be logged with the designated timber; (b) if needed, any such areas where the damaged undesignated timber can reasonably be logged separately; and (c) areas of affected or unaffected timber which by agreement are to be eliminated from Sale Area. By agreement, Purchaser and Forest Service shall locate and post the boundaries of all such areas as needed.

In such event, this contract shall be modified to include rates redetermined under B3.32 and other related revisions as agreed hereunder, such as revision of operating schedule to ensure prompt removal of affected timber when necessary to avoid further loss and acceptance of Contract Term Extension period if needed.

Plaintiffs' argument that catastrophe-affected timber automatically becomes included timber conflicts with the plain language of B8.33. B8.33 does not set out bright-line standards regarding what catastrophe-damaged timber becomes included timber. Instead, it sets out a process by which the *Forest Service* outlines what areas of damaged timber it proposes to allow a purchaser to harvest. It also calls for consultation between the parties regarding what timber should be harvested. Modification is required in the event agreement is reached. There is plainly nothing automatic about this process.

Plaintiffs disagree, pointing to the second paragraph of B8.33, which they contend sets out the only changes requiring modification, namely, for such things as rates and operating schedules. They argue that its reference to "other related revisions as agreed hereunder" pertains to logging methods, not for addition of timber. This language was plainly meant to encompass more than just logging methods. It is unclear what revisions such language could be referring to under B8.33 if not the extent of catastrophe-affected timber to be harvested.

In any event, other provisions in the contract make clear that B8.33 does not act to automatically include catastrophe-affected timber. Clause B8.22 provides that, once B2.133 is triggered by catastrophe, the contract will either be modified under B8.33, following rate redetermination, or terminated. Clause B8.222 sets out the circumstances under which the contract is to be terminated. It directly links termination with B8.33 consultations:

This contract shall be terminated by written notice from Forest Service if there is Catastrophic Damage and Purchaser does not agree under B8.33 to one or a combination of the following within 30 calender days of receipt from Forest Service of contract modifications proposed to permit the harvest of the catastrophe-affected timber in areas outlined under B8.33:

(a) To include Catastrophically–Damaged undesignated timber that normally would be salvaged and cannot reasonably be logged separately from included Timber; or

(b) To permit salvage operations by others; or

(c) To eliminate areas of damaged or devalued timber from Sale Area.

Read as a whole, the contract provides that catastrophe-affected timber becomes included timber only after consultation and by modification. It does not automatically become included timber.[6]

---

**5.** Whether the catastrophically-affected timber meets utilization standards is not at issue for purposes of the motions.

**6.** Plaintiffs rely on the doctrine of *contra proferentem,* which places the risk of ambiguity upon the drafter in the case of two reasonable competing interpretations. Restatement (Second) of

## II. Obligations Under Clause B8.33

Plaintiffs argue, in the alternative, that defendant failed to meet its consultation obligations under clause B8.33. As a result, plaintiffs allege they were denied timber to which they were entitled. This argument has taken on a protean character in the briefing. It has changed substantively between the original complaints and the supplemental briefs. In its current form, the plaintiffs appear to be making two separate arguments. They first allege that the Forest Service breached the contracts by unilaterally delineating on the sale area map the areas of catastrophe-affected timber that should have been logged with the originally-designated timber. Second, at oral argument and in their most recent briefing, plaintiffs appear to argue that Phase I improperly omitted whole portions of the original sale areas.

Defendant argues that it fulfilled all of its obligation under B8.33 when Ms. Debra Whitman, the Timber Program Manager and contracting officer for Six Rivers National Forest, met with plaintiffs prior to the modifications. It further argues that any factual dispute as to the exact nature of the consultation is immaterial, as the best evidence that the parties consulted is that they executed bilateral modifications to the contracts. As to the second prong of plaintiffs' argument—failure to address in Phase I all of the sale areas—defendant makes no direct response.

It is undisputed that, on April 11, 2001, plaintiffs met with Ms. Whitman to discuss harvesting of catastrophe-affected timber within the sale area. In her declaration, Ms. Whitman states that she brought a copy of the map created as part of Phase I to the meeting. This map showed areas in which the Forest Service proposed to allow harvesting of damaged timber for the purpose of

reducing the risk of wildfire to local communities. Ms. Whitman used an overlay of the map to show where the Forest Service's Phase I harvest areas overlapped with the Griz and West Lone Pine sale areas. Plaintiffs made clear at that meeting their desire to harvest all of the proposed areas that fell within the boundaries of their sale areas. Ms. Whitman did not feel this was appropriate, however. She stated that many of the burned areas within the sale areas did not overlap with any of the plaintiffs' harvest units. Because of this, she felt it was reasonable to have those areas harvested separately. In addition, she noted that there was little originally designated timber remaining on the sales that had not already been harvested and, therefore, that almost all catastrophe-affected timber likely could be harvested separately.

Ms. Whitman proposed, nevertheless, to allow harvesting of catastrophe-affected timber in all Phase I "proposed treatment areas," but only where those areas overlapped plaintiffs' contract harvest units by 50% or more. The Forest Service thought these areas should be harvested because "it would be more efficient to have the purchasers already working in the area harvest the timber." Whitman Decl. ¶ 7. Further, the Forest Service proposed allowing plaintiffs to harvest additional areas of damaged timber along roads plaintiffs would be using, despite the lack of overlap. Plaintiffs' representatives protested but eventually executed contract modifications, agreeing to harvest those areas proposed by Ms. Whitman. In July 2001, on the same day the Phase I EIS was issued, plaintiffs executed contract modifications agreeing to harvest certain catastrophe-affected timber within the original sale ar-

Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement ... that meaning is preferred which operates against the party who supplies the words"). Plaintiffs correctly point out that "there is no requirement that, in order to prevail, the contractor's interpretation must be more reasonable than the government's." Pls.' Mot. Summ. J. at 17. Plaintiffs' interpretation, however, must harmonize and give reasonable meaning to all the contracts' provisions to be considered reason-

able. See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434–35 (Fed.Cir.1996) (stating that a contract must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts). In this case, plaintiffs' interpretation contradicts the plain language of the contracts and fails to give meaning to B8.33, B8.22, and B8.222. The doctrine of contra proferentem, therefore, is not triggered.

eas.[7]

*A.  Consultations*

We conclude that the Forest Service did not breach the contract by the way in which it determined what damaged timber to offer. Clause B8.33 makes it clear that it is up to the Forest Service to outline the areas of damaged timber offered to purchasers. The Forest Service is merely required to consult purchasers. "Consultation," the term used by the contracts, is defined by Black's Law Dictionary as "1. The act of asking the advice or opinion of someone ... 2. A meeting in which parties consult or confer." *Black's Law Dictionary* 335 (8th ed.2004). Webster's New World Dictionary defines it as "the act of consulting" or " a meeting to discuss, decide, or plan something." *Webster's New World Dictionary* 299 (3rd Coll. ed.1988). "Consult," in turn, is defined as "to seek an opinion from; ask the advice of ... to refer to or turn to, esp[ecially] for information" or "to keep in mind while acting or deciding; show regard for; consider." *Id.* Thus, the contracts merely require an exchange of information. The Forest Service is not bound to accept the purchaser's opinion of what should be logged with designated timber. Even viewing the facts in a light most favorable to plaintiffs, this exchange of information took place.

Plaintiffs respond that, at a minimum, the Forest Service should be held to the standard adopted in one of its own white papers. This document, titled "Contract and Sale Preparation Issues with Catastrophic Damage" ("White Paper"), was drafted and updated by Mr. Rex Baumback, a Forest Service official in the Washington office, to guide contracting officers through the B8.33 process.[8] They allege that the White Paper shows that the agency interpreted clause B8.33 as obligating it to outline and offer all of the catastrophe-affected timber meeting utilization standards which could be harvested consistent with applicable environmental standards. We disagree. The document does not set out a mechanical rule. Instead, the White Paper states that the purchaser is "entitled to all of the originally designated included timber, as well as all of the damaged timber that meets environmental standards for harvest and *should be logged* with the designated included timber." Pls.' App. at 51 (emphasis added). This discretionary language is similar to the standard found in clause B8.33. The contract, in short, merely points to clause B8.33.

Under clause B8.33, the Forest Service is to outline areas of damaged timber "so situated that it should be logged" with designated timber. The areas designated must then be offered to purchasers. The White Paper cites *a number of factors relevant to this determination*, such as potential harvesting and transportation conflicts if different purchasers attempted to harvest in the same areas and the capability of the purchaser to harvest the timber before significant deterioration. The White Paper makes clear, moreover, that there is no obligation to offer purchasers damaged timber if it can reasonably be harvested separately from designated included timber:

> The fact that the purchaser wants to log the damaged timber is not a criterion, if the damaged timber can reasonably be logged separately from included timber. The Forest Service is not required to add damaged timber that can reasonably be logged separately any more than the purchaser is required to agree to have it added. Damaged timber that can reasonably be logged separately from included timber

---

7.  Approximately a month prior to the April meeting, plaintiffs met with Ms. Whitman to discuss contract modifications relating to another, less extensive project, the Megram Hazard Tree Project. This involved the removal of damaged trees along roads that posed a hazard to the public. The Forest Service prepared an EIS and met with plaintiffs regarding whether any of the damaged timber within the proposed treatment areas should be added to their contracts. Ultimately, the parties agreed that plaintiffs should harvest all roadside hazard trees within their sale areas.

In April 2001, the parties executed contract modifications reflecting their agreement.

8.  It is unclear from the record whether Ms. Whitman was guided by this document during the meetings with plaintiffs. In any event, while the document is helpful, it merely reflects one official's interpretation of the contract language. Ultimately, we must look to the contract language itself.

will be added only when it is mutually beneficial to both parties. The Forest Service is not obligated to add timber to an open sale that has all of [the] included timber removed.

*Id.* The White Paper essentially defines what trees should be logged with designated timber in negative terms—damaged timber that cannot reasonably be harvested separately from designated included timber. This interpretation is consistent with the language of the contract.

There is no basis to conclude from the record that the Forest Service breached its duty to consult, at least with respect to the Phase I timber. Although it unilaterally designated the additional timber for plaintiffs to consider, it did so after consulting with them.

## B. Outlining Sale Areas

■ We next turn to whether the Forest Service, in fact, properly outlined the areas of catastrophe-affected timber "so situated that [they] should be logged with the designated timber." As discussed above, the contract requires these areas to be offered to purchasers.

Plaintiffs focus primarily on the Forest Service's decision to conduct a Phase I environmental analysis for an area that extended far beyond the Griz and WLP sale areas but that included only portions of the sale areas. They point out that the Phase I map, which Ms. Whitman used during her meeting with plaintiffs, did not cover all of the contract sale areas. Further, they assert that Ms. Whitman made it clear to plaintiffs that she intended to offer plaintiffs more damaged timber after a follow-up project, Phase II, was approved. They claim that this shows that the Forest Service itself knew that Phase I did not cover all of the areas of damaged timber to which plaintiffs might have been entitled. Plaintiffs contend that a smaller, independent analysis should have been done, limited to all of the Griz and WLP sale areas.

It is worth noting what plaintiffs do not argue in this connection:

Purchasers do not assert that the Forest Service's decision to proceed in this man-

ner was an improper exercise of the Forest Service's discretion under NFMA in deciding how to respond to the Megram Fire. However, the Forest Service's decision to meet its independent obligations to comply with NFMA did not somehow excuse its failure to comply with the specific requirements of clause B8.33 of the contracts.

Pls.' Mot. Summ. J. at 24. They also concede that Ms. Whitman "apparently applied the correct criteria in determining what catastrophe-affected timber should be logged with the originally designated timber (i.e., considerations of efficiency and safety)." Pls.' Supp. Br. at 12.

We agree with plaintiffs that both the contracts and the White Paper indicate that the Forest Service was obligated to outline all areas of damaged timber within the sale area. Clause B8.33 refers to the entire sale area map and requires the Forest Service to outline all areas of damaged timber under either clauses (a), (b), or (c). If any area is not to be considered by the Forest Service, or the purchaser no longer wishes to harvest those areas, they may be eliminated under (c), but only by agreement of the parties. The White Paper explains:

The entire area with damaged timber, within the sale area, should first be identified under either paragraph (a) or (b). Any part of the sale area may be eliminated under paragraph (c), including areas identified under paragraphs (a) or (b) or areas that have not been damaged. The decision to eliminate an area from the sale area must be made by agreement. If the purchaser wants to eliminate an area from the sale area, it should generally be eliminated. If the Forest Service wants to eliminate an area, it requires the purchaser's concurrence.

Pls.' App. at 50.

All catastrophe-affected timber within the entire sale area, therefore, must have been eventually considered. We note, however, that the contract does not expressly prohibit the type of two-step approach to the outlining process that was apparently used here. Plaintiffs obviously were aware that remaining portions of the sale areas would be dealt with outside of Phase I. Indeed, they contend

that this staging is per se proof of breach. To the extent plaintiffs' argument is that the mere fact of staging is proof of breach, however, we disagree. The parties' apparent understanding was that the balance of the sale areas would be dealt with separately. Nothing in the contract precludes this approach.

By not considering all areas of catastrophe-affected timber to which plaintiffs might have been entitled, however, the Forest Service assumed the risk that events would conspire to prevent completion of the outlining process. Whether there was timber that should have been offered ultimately to plaintiffs, and whether, if it had been offered earlier, it could have been harvested successfully, has not been addressed by the parties.

The issue of whether the Forest Service's failure to deal with all potential catastrophe-affected timber was a breach is thus not ripe for summary judgment and must be preserved for trial. We note, however, that even if plaintiffs prove at trial that they were denied damaged timber to which they were entitled, such an error may be immaterial. Even the timber included in the July 2001 modifications became commercially worthless before it could be harvested. The additional timber is likewise inextricably linked to the contention in Count II that the Forest Service improperly delayed contract performance. Plaintiffs, therefore, must show that the Forest Service unreasonably caused the delays that prevented them from harvesting all of the additional timber—the timber originally agreed upon by the parties in the modifications and any further timber the Forest Service should have offered.

### III. Implied Duties to Cooperate and Not to Hinder

In Count II plaintiffs claim that the Forest Service breached the implied duties to coop-

erate and not to hinder. Plaintiffs argue that the Forest Service breached its implied duties in that its unreasonable conduct in preparing the EIS provoked the district-court-ordered suspensions. These suspensions, in turn, unduly delayed plaintiffs' ability to harvest timber to such an extent that it became commercially worthless by the end of 2001. During oral argument, counsel for plaintiffs asserted, in an answer to a question from the court, that Trinity and Hagen would have been able to harvest the additional catastrophe-affected timber within the six months between the July 2001 contract modifications and the point at which the timber was too deteriorated to harvest. They did not provide a minimum time-frame needed to harvest the timber, however. To succeed in their claims under Count II, plaintiffs would also have to demonstrate that, absent delay caused by the Forest Service, sufficient time would have been available to permit the harvesting of timber before the end of the 2001 season.[9]

The obvious difficulty for plaintiffs is that the suspensions were prompted by orders of the district court. In an effort to avoid this apparent defense, plaintiffs contend, as best as the court understands their argument, that the district court would not have ordered the suspensions, or, alternatively, the litigation would not have been brought if the Forest Service had done a better job preparing the EIS.

In this connection, plaintiffs place great reliance on *Precision Pine & Timber, Inc. v. United States*, 50 Fed.Cl. 35, 59 (2001), which held that, for a delay to give rise to a breach of the duties to cooperate and not to hinder, the contractor must prove that the government caused the delay and that it was of sufficient magnitude and hindrance to the contractor's operations to con-

9. At oral argument, plaintiffs' counsel also argued that more time would have been available to harvest the timber if the Forest Service had completed its environmental analysis more quickly. Counsel alleged that this could have been done by focusing the environmental analysis on a smaller area covering only the Griz and WLP sale areas. We note, first, that counsel has conceded that the Forest Service wielded substantial discretion in deciding how to respond to

the fire. *See supra* Part II.B. Second, such an approach may have been precluded by NEPA's requirement that all "connected," "cumulative," or "similar" post-fire actions be analyzed in a single EIS. *See Bosworth*, 199 F.Supp.2d at 987–90. In any event, such an argument was not clearly presented in the complaint or plaintiffs' briefs. If plaintiffs wish to pursue the point, they must do so in connection with further pre-trial proceedings.

stitute a breach. Here, plaintiffs contend that the findings of the district court in *Bosworth* are per se evidence that the Forest Service breached its duties. *Bosworth* involved a challenge by environmental activists to the sufficiency of the Phase I EIS. The district court concluded that the Phase I EIS prepared by the Forest Service violated NEPA's and NFMA's procedural requirements. 199 F.Supp.2d at 971. Plaintiffs argue, further, that the deterioration of the timber supports a finding that the delays were of a sufficient hindrance to their operations to constitute a breach. Defendant does not contest the district court's findings. Instead, it contends that the mere fact that the Forest Service failed to comply with statutory environmental requirements is not sufficient to prove breach of contract.

Clause C6.01 of the contracts grants the Forest Service suspension authority in three circumstances. It permits the Forest Service to suspend the timber sale contracts for the following: (a) to prevent serious environmental or resource damage that may require contract modification or termination; (b) to comply with a court order; or (c) upon a determination that conditions existing on the sale are similar to the conditions of another sale suspended pursuant to a court order. This authority is not unlimited, however. It is limited by the implied duties to cooperate and not to hinder found in every contract, which are subspecies of the implied duty of good faith and fair dealing. *Precision Pine,* 50 Fed.Cl. at 59; *see also Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988); *Kehm Corp. v. United States,* 119 Ct.Cl. 454, 469, 93 F.Supp. 620 (1950); *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 549 (1984).

■ In contexts similar to those at bar, these implied duties prevent the Forest Service from suspending contracts indefinitely in order to comply with a court order if its own unreasonable or wrongful actions caused the order to be imposed, or if it unreasonably delayed in remedying the offending circumstances. *See H.N. Wood Prods., Inc. v. United States,* 59 Fed.Cl. 479, 487 (2003); *Precision Pine,* 50 Fed.Cl. at 61. The question, therefore, is whether the Forest Ser-

vice's actions were reasonable, both in drafting the EIS and in litigating its sufficiency.

The reasonableness inquiry is intensely factual. *Scott Timber Co. v. United States,* 333 F.3d 1358, 1369 (Fed.Cir.2003). In making that determination, the court must examine the " 'contract, its context, and its surrounding circumstances.' " *Cedar Lumber,* 5 Cl.Ct. at 550 (quoting *Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 338 F.2d 81 (1964); *see also* 3 *Corbin on Contracts* § 570A (Supp.2000) (noting that determining the scope of the implied duties to cooperate and not to hinder is a highly factual endeavor and must be resolved on a case-by-case basis). Summary judgment is only appropriate if there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the initial burden of showing that there are no genuine issues of fact. *H.N. Wood Prods.,* 59 Fed.Cl. at 485. Further, it is not appropriate for the court to grant summary judgment where there are unexplained gaps in the movant's evidence if those gaps relate to issues on which the movant will bear the ultimate burden of proof at trial. *Id.* If there is reason to believe that the better course would be to proceed to trial in order to obtain a full hearing of the material facts, summary judgment should be denied. *Id.* at 486–87.

Because of its importance in plaintiffs' motion, we will examine *Precision Pine* in some detail. In *Precision Pine,* timber sale contracts were suspended to comply with an Arizona district court's injunction requiring the Forest Service to submit its Land Resource Management Plans ("LRMPs") for formal consultation with the Fish and Wildlife Service ("FWS") as required by the Endangered Species Act ("ESA"). 50 Fed.Cl. at 38 (citing *Silver v. Babbitt,* 924 F.Supp. 976 (D.Ariz.1995)). All the contracts, save one, contained clause CT6.01, which had language identical to C6.01 and granted the Forest Service suspension authority to comply with a court order. The Court of Federal Claims found that the suspensions were unreasonable and granted summary judgment to plaintiffs.

Chief Judge Damich recognized that the government can be held liable for delays in timber contracts caused by its own unreasonable failure to submit Forest Service plans when such delays are entirely within the control of the government. *Precision Pine,* 50 Fed.Cl. at 65. In his analysis, he utilized the *Cedar Lumber* standard: For a delay to give rise to a breach of the duties to cooperate and not to hinder, the contractor must prove the cause of the delay was the fault of the government, and that the delay was of sufficient magnitude and of a sufficient hindrance to the contractor's operations to constitute a breach. *Id.* at 59 (citing *Cedar Lumber,* 5 Cl.Ct. at 550). He viewed the ultimate consideration as one of reasonableness, relying on *Scott Timber Co. v. United States,* 40 Fed.Cl. 492, 502, 504 (1998), *vacated on other grounds,* 333 F.3d at 1367.[10]

Chief Judge Damich determined, first, that the delay was the fault of the government.[11] *Precision Pine,* 50 Fed.Cl. at 59, 70 (citing *Cedar Lumber,* 5 Cl.Ct. at 539, and *Chalender v. United States,* 127 Ct.Cl. 557, 563, 119 F.Supp. 186 (1954)). He observed that the Forest Service had a genuine legal argument that it did not have to submit its existing Region 3 LRMPs for consultation. *Id.* at 67. Once the Ninth Circuit issued its decision in *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1053 (9th Cir.1994), clearly settling the matter, however, the Forest Service's insistence on not submitting its LRMPS was no longer justified. *Precision Pine,* 50 Fed.Cl. at 69. The court also noted that other Forest Service regions had submitted their LRMPS in compliance with *Pacific Rivers,* that the Forest Service was in the midst of a lawsuit in Arizona district court in which the plaintiffs were seeking to force the Forest Service to submit their LRMPs for consultation, and that the Forest Service's own attorneys at the Department of Justice maintained that *Pacific Rivers* was applicable and

"strongly urged" the Forest Service to comply. *Id.* Most importantly, the court cited evidence that the Chief of the Forest Service himself noted in a letter that *Pacific Rivers* was likely applicable, and, therefore, that this was not a case of reasonable mistake. *Id.*

The court then determined that the length of the suspensions was unreasonable.[12] *Id.* at 70. The suspensions in that case began when the Arizona district court issued its injunction halting timber sale operations until formal consultations were completed. Normally, if the Forest Service followed regulatory procedures, consultation should have been completed in approximately 135 days. In *Precision Pine,* however, the suspensions lasted 467 days. Chief Judge Damich made clear that the fact that the suspensions lasted longer than provided for in the regulations "does not in itself suggest that the length of the delay was unreasonable and was the fault of the Forest Service." *Id.* But he determined that the Forest Service was culpable for prolonging the suspensions based on its unreasonable actions after the district court issued its injunction. Arizona district court orders amply documented a number of the agency's substantive and procedural mistakes. In one of those orders, the district court stated that the Forest Service had not "work[ed] as diligently as [it] should" to comply with the requirements of the ESA so that the suspension may be lifted. *Id.* at 71. The district court also noted that "the [Forest Service] is the culprit ... for the delays, not the Court." *Id.* In fact, the agency's conduct led the district court to go so far as to threaten contempt proceedings. *Id.* at 49 ("[T]he Court will hold [the Director of the Forest Service] responsible for the [Forest Service] if it fails to carry out its duties under the ESA, regulations, stipulation of the parties and orders of this court.").

While the facts in *Precision Pine* warranted summary judgment, the Federal Circuit,

---

**10.** Likewise, we view the *Cedar Lumber* standard as simply contained within the reasonableness analysis.

**11.** The *Precision Pine* court analyzed the implied duties to cooperate and not to hinder separately. In doing so, it dealt with the issue of fault mainly in its analysis of the duty to cooperate. It incor-

porated those findings in its analysis of the duty not to hinder.

**12.** These facts further supported the finding that the delays were the fault of the government because they took place after the contracts were suspended and prolonged the consultation period.

in *Scott Timber*, has indicated that summary judgment in such cases is rarely appropriate. 333 F.3d at 1359. *Scott Timber* involved the suspension of a timber sale contract to protect the marbled murrelet. After the timber sale contract was awarded, the Audubon Society filed suit in district court to force the FWS to list the murrelet as a threatened or endangered species and to force the Forest Service to protect the murrelet under the NFMA. In response, the district court issued a temporary restraining order halting logging in murrelet habitat. The Forest Service immediately suspended the contracts. Soon after, the FWS listed the murrelet as a threatened species by order of the district court. Upon listing of the murrelet, the Forest Service began consultations with the FWS to analyze the impact of the timber sales on the murrelet. These consultations lasted approximately two years, far in excess of the 150 days allowed by statute. At the trial level, the Court of Federal Claims initially denied summary judgment to both parties, ruling that exceeding the consultation period was not per se unreasonable. It also found that reasonableness of the suspensions was a question of fact. 40 Fed.Cl. at 507. On reconsideration, however, the trial court granted summary judgment to the defendant. 44 Fed.Cl. at 181. The Federal Circuit reversed, issuing a cautionary instruction that "[b]ecause the reasonableness issue is intensely factual, this court finds that the Court ... erred when it determined the suspensions were reasonable on summary judgment." 333 F.3d at 1369.

Cases following *Scott Timber* have heeded its warning in circumstances similar to those here. *Shawn Montee, Inc.*, 04–1 B.C.A. (CCH) ¶ 32,564, at 161,064, 2004 WL 473250 (2004), for example, involved five timber sale contracts awarded as part of a project to salvage timber and stem an outbreak of bark beetles. After environmental activists initiated a series of court challenges to the sufficiency of the Forest Service's EIS, a temporary restraining order was issued halting timber operations. In order to comply with the court order, the Forest Service suspended the contracts. Approximately one year after the temporary restraining order was issued, a district court issued a ruling on the merits and found that the EIS failed to comply with NEPA and NFMA. The contractor argued that the Forest Service breached the implied duties to cooperate and not to hinder and asked for summary judgment on that issue. As here, the contractor relied upon the district court's finding under the Administrative Procedures Act, 5 U.S.C. § 706 (2000), and the fact that the suspensions significantly delayed their operations. The agriculture board denied summary judgment. In doing so, the board cited *Scott Timber*, stating "[e]rror or misjudgment is not per se unreasonable." *Shawn Montee, Inc.*, 04–1 B.C.A. (CCH) at 161,074, 2004 WL 473250. Moreover, the board noted that the contractor "must show more than simply violation of a statute on the part of the [Forest Service].... It must show that the [Forest Service's] actions were not reasonable .... Whether the [Forest Service] acted reasonably is an intensely factual question." *Id.* The board found that it could not grant summary judgment because a trier of fact could find that the Forest Service acted reasonably. The board highlighted the lack of clear notice to the Forest Service that its actions did not meet statutory requirements and the absence of inappropriate delaying procedures prolonging the suspensions. The board concluded that "the issue before us is what did the Forest Service know or what should it have known, and with that knowledge, did it act reasonably in the context of these contracts and Project. That is not a matter that is going to be resolved on summary judgment." *Id.* at 161,078.

In *Tamarack Mills, LLC*, 04–1 B.C.A. (CCH) ¶ 32,591, at 161,219, 2004 WL 671159 (2004), the agriculture board rejected an argument similar to the one asserted in *Shawn Montee*, and denied summary judgment. It held that a breach of the implied duties to cooperate and not to hinder cannot be established simply by a district court finding that the Forest Service's EIS violated NEPA and NFMA: "The fact that a court found the Forest Service to be arbitrary and capricious in an APA review does not necessarily lead to a finding of breach as to a contract affected by the [Forest Service's] errors." *Id.* at 161,228. As to the length of the suspensions,

the board noted that "environmental errors and delays are not . . . rare when the [Forest Service] issues timber sales. Environmental litigation is a fact of life." *Id.* at 161,230. The relevant factual inquiry was " 'whether the Government used reasonable diligence and good faith in attempting to avoid or in mitigating the delay or whether the delay was unreasonable under the circumstances.' " *Id.* (quoting *Superior Timber Co.,* 97–1 B.C.A. (CCH) ¶ 28,736, at 143,416, 1996 WL 719922 (1996)).

Similarly, in *H.N. Wood Products* a timber sale contract was suspended shortly after the Forest Service received two decisions of the United States District Court for the Southern District of Illinois. 59 Fed.Cl. at 479. Environmental groups brought an action challenging the preaward environmental assessments performed by the Forest Service under NEPA. The district court granted summary judgment to the environmental groups on one issue and ordered the Forest Service to correct the deficiencies in its environmental assessment. For over two months, the Forest Service attempted to correct its assessment and get the district court's approval. Its attempts were rejected and the district court ultimately ordered the agency to issue a new environmental assessment. During this time, the Forest Service suspended the contracts. In a challenge brought in this court, the plaintiffs made arguments almost identical to the ones here. The court rejected H.N. Wood's arguments and ruled that summary judgment was not appropriate. It first rejected the plaintiff's reliance on *Precision Pine* and *Superior Timber* on the grounds that those decisions turned on when the Forest Service was put on notice that its environmental assessment was inadequate. The court relied on *Scott Timber* for the proposition that reasonableness is a question of fact. It found that H.N. Wood had failed to proffer sufficient evidence related to whether the Forest Service conducted itself "diligently and in good faith and whether it knew or should have known that its environmental assessment was inadequate when it awarded the contract." *Id.* at 491. As to whether the length of the suspensions was unreasonable, the court found that there were unexplained gaps in the record that

needed to be filled in at trial. One gap pertained to whether or not the suspensions were foreseeable or preventable by the Forest Service prior to contract award. *Id.* at 492–93. Another was whether the Forest Service unduly prolonged the delay by its contract administration after the formal suspension went into effect. *Id.*

■ These cases demonstrate that a breach of the implied duties to cooperate and not to hinder may be found where the government causes delay by unreasonably prolonging timber contract suspensions or by unreasonably provoking the suspension of a contract. If such a breach causes harm to purchasers, the government may be found liable for damages.

■ Turning to the instant case, the undisputed facts do not show that the agency unreasonably prolonged the contract suspensions by failing to act diligently in complying with the district court's orders as it did in *Precision Pine.* The first suspension began on July 19, 2001, in response to the first temporary restraining order issued by the district court. On the same day, however, the district court dismissed the suit at the request of the environmental groups, presumably because the automatic stay associated with the pending administrative appeal would act to prohibit timber operations. It is unclear whether the suspension, which cited the temporary restraining order, remained in effect after the suit was dismissed. What is clear is that timber operations were still barred until October 4, 2001, when the Forest Service denied the environmental groups' appeal challenging the EIS. On October 17, 2001, the environmental groups again filed a claim in district court challenging the EIS and the court issued a temporary restraining order on October 19, 2001. On October 26, 2001, the Forest Service again suspended the contracts citing the second temporary restraining order. The district court issued its decision on the merits and permanent injunction in April 2002. This suspension remained in effect until the contracts were terminated on December 6, 2002, as ordered by the district court. Thus, the Forest Service was not ordered to correct the Phase I EIS until

April 2002, at least four months after the timber had already become worthless.

Plaintiffs contend, however, that the Forest Service failed to act reasonably in drafting the EIS. In other words, they argue the agency "knew or should have known that its environmental assessment was inadequate when it awarded the contract." *H.N. Wood Prods.*, 59 Fed.Cl. at 491. To succeed, plaintiffs would have to demonstrate that the Forest Service was so derelict in its preparation of the Phase I EIS that it provoked a challenge which otherwise would not have arisen, or that it was unnecessarily sustained.

In this regard, the *Bosworth* decision is insufficient alone to entitle plaintiffs to relief. The standards of conduct under the Administrative Procedures Act are not identical to the implied duties to cooperate and not to hinder. *See Tamarack Mills, LLC*, 04–1 B.C.A. (CCH) at 161,228. As the Federal Circuit held in *Scott Timber Co.*, violation of statutory obligations not incorporated into a contract does not automatically establish a breach of contract. 333 F.3d at 1369; *see also Precision Pine*, 50 Fed.Cl. at 61 ("[E]ven if the Forest Service had violated a statute or regulation, this would not ipso facto mean that there was an unreasonable delay."). The violations found in *Bosworth* merely "serve as a factor in the reasonableness analysis." *Scott Timber*, 333 F.3d at 1369 (citing *Precision Pine*, 50 Fed.Cl. at 63); *accord Tamarack Mills, LLC*, 04–1 B.C.A. (CCH) at 161,219.

In any event, there are genuine issues of material fact which preclude summary judgment. There is evidence, for example, that plaintiffs were aware of the Phase I process and supported it. Trinity River's Dee Sanders informally advocated aggressive timber harvesting as the means to rehabilitate the area affected by the Megram Fire, Def.'s Supp.App. at 49 ("I want to encourage the Forest Service to take an aggressive position .... [P]rotection from future catastrophic fires depends heavily on the use of timber salvage"), and voiced Trinity's concern that the burnt timber would rot before it could be harvested if the EIS process was drawn out, *id.* at 51 ("To understand that it is OK to barge logs in from Washington and Canada

while we let million of feet of timber rot 50 miles away is beyond my comprehension"). Plaintiffs' counsel, acting on plaintiffs' behalf, urged the Forest Service to "allow immediate implementation" of Phase I. *Id.* at 56. Plaintiffs also warned that a failure to implement Phase I promptly would increase the risk of fire from higher fuel loads, thereby threatening environmentally sensitive areas that Phase I intended to protect. *Id.* at 58. Finally, the Forest Service's position that its EIS was sufficient was supported by the administrative appeal process.

On the other hand, the *Bosworth* court found seven violations of NEPA and one violation of NFMA. Plaintiffs point out that the sheer number and type of violations suggest that the Forest Service acted unreasonably. At this point, it is sufficient to hold that such evidence is relevant. If the Forest Service had knowledge that its EIS was inadequate before it was issued, it would be unreasonable to award a timber sale contract in light of the risk that environmental groups would challenge the plan. There is a gap in the evidence, however, with respect to what the Forest Service knew before it issued the EIS.

Under these circumstances, the better course would be to proceed to trial in order to obtain a full hearing of the material facts. At trial the issue will be whether the Forest Service conducted itself "diligently and in good faith and whether it knew or should have known that its environmental assessment was inadequate when it awarded the contract." *H.N. Wood Prods.*, 59 Fed.Cl. at 491.

What we have said thus far relates only to breach of duty. A separate issue arises as to causation, which neither side has addressed adequately in its briefs. Plaintiffs focus most of their attention on the Forest Service's actions prior to the July 2001 modifications. Their argument assumes that the agency's actions, if unreasonable, impacted their ability to harvest the catastrophe-affected timber. They claim that the suspensions caused by the litigation would have been nonexistent or shorter if the Forest Service had complied with NEPA and NFMA while drafting the Phase I EIS.

Regarding plaintiffs' assertion that the delay could have been shorter, it is possible that the temporary restraining orders would not have been issued if the district court determined that the environmental groups were likely to be unsuccessful on the merits. It is undisputed that, from the time the contracts were modified on July 9, 2001, and the parties agree that the timber became worthless in December 2001, plaintiffs would have had just under six months to harvest the timber. The temporary restraining orders, however, only delayed plaintiffs' harvesting from October 19, 2001, forward. Before October, harvesting was prohibited by the automatic administrative appeal (with the exception of the seven days the temporary restraining order was in effect and the ESD prevented the automatic stay from taking effect). This leaves plaintiffs approximately two and one-half months in which the litigation delays could have been demonstrably impacted by the insufficient EIS. Plaintiffs must prove, therefore, that they could have harvested the catastrophe-affected timber within that time-frame.

*IV. Risk of Loss Under Clause B8.12*

■ Plaintiffs contend in Count IV that the Forest Service is liable for the lost value resulting from the deterioration of damaged timber in the WLP and Griz sale areas. They rely on clause B8.12, which states:

> If Included Timber is destroyed or damaged by fire, wind, flood, insects, disease, or similar cause, the party holding title [13] shall bear the timber value loss resulting from such destruction or damage, except that such losses after removal of timber from Sale Area, but before Scaling, shall be borne by Purchaser at Current Contract Rates and Required Deposits. There shall be no obligation for Forest Service to supply, or for Purchaser to accept and pay for, other timber in lieu of that destroyed or damaged. This Subsection shall not be construed to relieve either party of liability for negligence.

13. Clause B8.11 states "title and interest in and to any Included Timber shall remain in Forest Service until is has been cut, Scaled, removed from Sale Area ... and paid for, at which time

Plaintiffs claim that the term "timber value loss" includes the lost market value of the damaged timber. Because the timber plaintiffs might have harvested is now commercially worthless, they seek payment from the Forest Service for that lost value.

Defendant responds that clause B8.12 merely allocates the risk of loss between the parties and that the government has already borne the loss because the timber has become worthless and the government received no payment for the timber, thus absorbing the entire loss. It argues that clause B8.12 does not provide for payment to a purchaser who has not paid for any of the timber, or who is not obligated to pay in the future.

We agree with defendant that clause B8.12 merely sets out the common-law principle that the party holding title bears the risk of loss. The principle is well-established:

> In connection with the sale of goods, it sometimes happens that after the contract of sale is entered into, the property that was the subject matter of the sale is accidently lost, destroyed, or damaged before delivery to the buyer, without the fault of either party. In such situations, the question thus arises whether the risk of the loss of the goods is borne by the seller or the buyer. Prior to the enactment of the Uniform Commercial Code, under the common law and the Uniform Sales Act the determination of who bore the loss generally depended on whether the seller or buyer had title to the goods; absent a contrary intention or agreement, the party who had title at the time the loss occurred bore the risk thereof. Accordingly, if title had passed to the buyer, he could not recover the price of the goods, or escape liability to the seller for the price if not yet paid, even though there had been no actual delivery of the property to him. On the other hand, the loss fell on the seller if the title had not passed; he could not recover the price of the goods, and was liable to the buyer for any payments that had been made.

title shall vest in Purchaser." It is undisputed that the Forest Service had title at the time the timber became worthless.

25 Am.Jur.2d *Proof of Facts* § 99 (2004). The allocation of risk of loss by this traditional device thus does not put the Forest Service in the position of guarantor of plaintiffs' profits. It simply means that the Forest Service cannot force plaintiffs to pay for the timber and must refund any payments made to the agency with respect to timber not successfully removed. The contract clause only shifts the risk to the purchaser after removal of timber from sale area, but before scaling.

Apparently recognizing that their argument is unorthodox, plaintiffs point out that clause B8.12 contains no language defining or limiting "timber-value loss." Had the government intended to limit its liability for "timber value loss," plaintiffs argue, it could have done so plainly as it did for "losses after removal ... but before Scaling." They contend that the court must not " 'by interpretation, engraft on a contract a limitation inconsistent with the apparent object of the parties ... even where it is clear that had the attention of the parties been called to the omission, they would have, in all probability, inserted the term.' " Pls.' Mot. Summ. J. at 46 (quoting Richard A. Lord, *Williston on Contracts* § 31:6 (4th ed.1999)). Further, " 'This court must not presume to supply remedies the parties did not provide each other by contract, particularly where the contract shows that the remedies were within the contemplation of both parties at the time of contracting.' " *Id.* (quoting *Scott Timber*, 333 F.3d at 1367). Finally, plaintiffs argue that the contract was one of adhesion drafted unilaterally by the Forest Service and, therefore, the court must interpret it in favor of the nondrafter.

These arguments are without merit. The court is not required to interpret a contract contrary to its plain meaning. Nor is the court inserting a limitation inconsistent with the apparent object of the parties. The language of B8.12 is clear. The parties chose to incorporate into the contracts fundamental principles regarding risk of loss, and modified them only in one instance, which does not apply here. The Forest Service agreed, as seller, to bear the risk that it would lose the value of the timber and could not require plaintiffs to pay for timber which was de-stroyed. The mere use of the term "timber value loss" does not modify how the Forest Service, as seller, would bear the risk of loss. It has borne the loss contemplated by the parties, and plaintiffs are entitled to no more under B8.12. We find nothing ambiguous about clause B8.12.

Plaintiffs also argue that prior Board of Contract Appeals decisions—*Don Dwyer Dev. Co., Ken Rogge Lumber Co.,* and *Fort Vancouver Plywood Co.*—support their claims and that the Forest Service knew of these decisions when it entered into the contracts. Therefore, they allege, that the Forest Service should be bound by those decisions. Our review of these decisions and others indicates that clause B8.12 has never been applied as plaintiffs suggest. Clause B8.12 has most commonly been applied in the context of rate redeterminations or to allow a contractor to recover its increased costs of processing harvested timber in the event of vandalism. *See Don Dwyer Dev. Co.,* 02–2 B.C.A. (CCH) ¶ 31,980, at 158,021, 2002 WL 31018848 (2002) (awarding Don Dwyer a price adjustment for timber value loss resulting from greater amounts of blue stain than anticipated by parties); *Buse Timber & Sales, Inc.,* 94–1 B.C.A. (CCH) ¶ 26,456, at 131,643, 1993 WL 441888 (1993) (awarding Buse Timber an amount reflecting its increased costs in processing timber that was "spiked" by vandals); *Ken Rogge Lumber Co.,* 84–2 B.C.A. (CCH) ¶ 17,381, at 86,591, 1984 WL 13395 (1984) (awarding Ken Rogge Lumber a price adjustment for reduced value of timber as result of theft). Contrary to plaintiffs' assertion, the board decisions suggest that B8.12 should not be interpreted as providing an independent remedy for the loss of timber, regardless of whether a contractor has an obligation to pay for it. *See Fort Vancouver Plywood Co.,* 88–1 B.C.A. (CCH) ¶ 20,289, at 102,650, 1987 WL 46064 (1987) ("Clause B8.12 only covers timber-value loss, not damages for breach."), *rev'd on other grounds,* 860 F.2d 409 (Fed.Cir.1988). To the extent that board decisions suggest otherwise, we respectfully disagree. *See Fort Vancouver Plywood Co.,* 90–3 B.C.A. (CCH) ¶ 23,166, at 116,267, 1990 WL 111058 (1990). They are, in any event, not controlling.

## V. Legal Significance of Modifications

At oral argument the court sought supplemental briefs regarding the legal consequences of the July 2001 modifications. In particular, the court asked the parties to address whether execution of the modifications precluded any of plaintiffs' current arguments. In response, plaintiffs argue that the doctrines of merger, substitute contract, parole evidence, waiver, and accord and satisfaction do not act to bar their claims. The common theme is that the modifications were not intended to be dispositive of plaintiffs' rights under clause B8.33 of the original contracts. In support, they again note Ms. Whitman's statements regarding her intent to offer plaintiffs more damaged timber after additional environmental analyses were completed for Phase II. *See supra* Part II.B.

Defendant does not dispute that the modifications were not intended to dispose of all of plaintiffs' rights to harvest catastrophe-affected timber. It concedes that, if the contracts had not been suspended, and then terminated for other reasons, additional modifications may have occurred. Nevertheless, it argues that the relevant contracts between the parties are the contracts as modified. It asserts that any obligations under the original contract were satisfied by the execution of the July 2001 modifications, citing a number of authorities discussing the doctrines of merger and substitute contract. *See Louisiana–Pacific Corp. v. United States*, 228 Ct. Cl. 363, 656 F.2d 650 (1981); *Carabetta Enter., Inc. v. United States*, 58 Fed.Cl. 563 (2003); *Alaska Am. Lumber v. United States*, 25 Cl.Ct. 518 (1992); Restatement (Second) of Contracts § 279 cmt. a (1981); John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 21–13,–5 (3d ed.1987).

We agree with plaintiffs that these defenses do not bar their claims. A substituted contract "is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it." Restatement (Second) of Contracts § 279 (1981). The fact that Ms. Whitman intended to offer more timber pursuant to Phase II calls into question whether the July 2001 modifications were intended to satisfy the original duty under B8.33 in whole. For purposes of summary judgment, we must conclude that the timber added by the modifications was neither offered by defendant nor accepted by plaintiffs as completely satisfying the Forest Service's obligations under B8.33.

Nor does merger bar plaintiffs' claims. While it is true that all prior oral discussions and negotiations were merged into the final written agreement, this merely means that Ms. Whitman's statements during consultations could not generate independent obligations. Finally, Ms. Whitman's statements would also render the defenses of waiver and accord and satisfaction unavailable, as we must conclude that the parties did not intend or imply that the July 2001 modifications were a complete resolution of the parties' dispute.

### CONCLUSION

For the reasons discussed above, defendant's cross-motion is granted as to Count IV and as to portions of Count I as set out above. The parties' cross-motions are denied in all other respects. The parties are asked to consult and propose, jointly if possible, a schedule for further proceedings. They are directed to file a joint status report on or before July 15, 2005.